# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00118-CV

---

**B. D. and S. P. D., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. 19-0743, THE HONORABLE DAVID JUNKIN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellants B.D. (Father) and S.P.D. (Mother) are the parents of "Lisa" and "Alan."[1]  Father also has two older children—"Charles" with mother "Wendy," and "Karla" with mother "Ellen."  The Texas Department of Family and Protective Services filed petitions seeking conservatorship of all four children in March 2019, and the three separate proceedings were consolidated into one case, which was heard by a jury in January 2020.  The jury determined that Mother's parental rights to Lisa and Alan and Father's rights to all four children should be terminated, and the trial court signed a decree consistent with that verdict.  Both Mother and Father appealed.  Mother challenges certain rulings by the trial court and the sufficiency of the evidence supporting the jury's findings on statutory grounds and best interest.  Father's

---

[1] For the sake of the children's privacy and for clarity, we refer to the parents as "Mother" and "Father" and to the children and other involved individuals by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

appointed attorney has filed a brief concluding that his appeal is frivolous, *see Anders v. California*, 386 U.S. 738, 744 (1967), and Father has since filed a pro se brief making several arguments. Because we agree that Father's appeal is frivolous and because we overrule Mother's issues, as explained below, we will affirm.

**FACTUAL AND PROCEDURAL SUMMARY**

Father was married to Wendy, and their son Charles was born in Minnesota in late 2004. In 2005, while married to Wendy, Father had a daughter, Karla, with then-fifteen-year-old Ellen. Wendy and Father divorced, and Father moved to Texas, where he met Mother in 2005 and married her in 2006. Charles, who was diagnosed as autistic, came to live with Father in Texas when he was about seven and stayed there until his removal by the Department in 2019.

Karla visited Texas during the summers of 2011 and 2012. In November 2012, she made an outcry of sexual abuse, and Ellen and her family sought help from Minnesota Child Protection Services. Minnesota CPS records and videotapes of Karla's interviews were introduced into evidence and reflect that Karla said that she did not want to go back to Father and that he had "kissed her on the lips with his tongue and that it was their secret," touched her genitals and breasts with his hand, touched her mouth and genitals with his penis, and "put his penis inside of her." She described an incident in which Father's "private was on [Karla's] private" and he moved "up, down, up, down, up, down." She further stated that white "stuff" from Father's "private" went on the ground and on her back. She said that she was "too afraid to talk" and that Father's actions made her "think ick." Minnesota CPS determined that Father had sexually abused Karla, but when Father appealed, the determination was overturned on jurisdictional grounds because the abuse occurred in Texas.

2

After Karla's outcry, Ellen attempted to stop Father from having visitation, which led to a lengthy custody dispute in which Father sought full custody. In 2016, while the custody case was still pending, Karla made another outcry about the 2012 abuse, saying that on multiple occasions he had "brought her into his bedroom and made her suck on his penis and inserted his penis into her vagina" and that she "was always afraid when [Mother] would have to leave to go to work." Karla told her therapist that "my dad fucked me and nobody did anything about it." Karla also reported that Father had "lots of swords and she is afraid he is going to come up here and kill her family and take her." Karla reported that she did not think Mother knew about the abuse and that she feared Father would also sexually abuse her siblings. Karla said that Texas authorities were informed about the abuse but that Father was never charged.[2] Mother testified that she did not know the details but that she knew of Karla's outcries through Father, who claimed Ellen had coached Karla. She also said that she did not have contact information for Ellen, who she called "a drug addict" who "habitually lies about everything."

Meanwhile, Lisa was born in 2011 and Alan was born in 2016. Mother believed Lisa was autistic, explaining that for "as long as I can remember when she was little," she had exhibited "unusual behavior" like "trouble making eye contact," banging her head when frustrated, and having difficulty sitting still or staying focused. She testified that doctors raised concerns about developmental delays when Lisa was about two years old and that she was evaluated when she was four. Mother first testified that she thought Lisa had been diagnosed with ADHD and autism but then later said she had been told that Lisa did not have a current

---

[2] In 2017, Minnesota CPS received an email from a detective in Texas saying the case had been closed because "there is not enough to corroborate [Karla's] story. It appears this case, along with other cases filed are due to a custody battle."

autism diagnosis. She said Lisa had a "504 Plan" starting in kindergarten, providing accommodations similar to those given to Charles.

Mother testified that in pre-kindergarten, Lisa began having bed-wetting issues and exhibiting "sexualized behavior," "rubbing herself" on furniture or the floor. Mother testified that she learned that autistic children would exhibit "rhythmic and comforting behavior," called "stimming,"[3] and that she believed Lisa's repetitive rubbing was stimming. Mother testified that she and Lisa "talked at length about how that wasn't appropriate behavior and she shouldn't be doing it" and that "those things were private."

Lisa continued to exhibit masturbatory behavior in kindergarten during the 2017-2018 school year. Deanna N., Lisa's kindergarten teacher, testified that "daily, mostly throughout the year" Lisa would do "certain movements [that] were not appropriate for a little kid to be doing." Ms. N. said that Lisa's behavior was abnormal for her age and that she repeatedly raised her concerns to Mother, who told Ms. N. to "just remind [Lisa] to stop" and "would let me know that she was taking [Lisa] to the doctor and that it was either a yeast infection or [urinary tract infection] and they were addressing it with some yogurt." However, Lisa's behavior continued throughout the year and "never cleared up." Ms. N. testified that she reported the behavior to the principal and the school counselor, and she said that the principal reported the behavior to the Department, but no action was taken.

Mother testified that when Lisa's kindergarten teacher talked to her about it and "recommended ruling out anything physical," Mother "took her to the doctor to make sure it wasn't a UTI or yeast infection. She said it wasn't. We thought it might be behavioral and we

---

[3] The reporter's record uses "stemming," but we will use the more accurate term "stimming," from "self-stimulation." *See* Stimming, https://en.wikipedia.org/wiki/Stimming (last visited Aug. 21, 2020).

4

talked about that." Mother testified that by first grade she thought Lisa's sexualized behavior "had decreased significantly so I thought it wasn't happening at school anymore." It was still happening at home once or twice a week, and Mother said she "would get her to get up and engage in another activity . . . that would put her mind elsewhere." Cecilia R., Lisa's first grade teacher, twice saw Lisa exhibit masturbatory motions in the classroom. She mentioned it to Mother, along with Lisa's tendencies to get lost and to get easily upset, and Mother told her that a doctor "said [Lisa] has possibly some characteristics of autism." Ms. R. knew about Lisa's sexualized behavior from Ms. N. and "thought it was just a behavior problem."

In September 2018, a Minnesota judge granted Father custody of Karla because, according to Minnesota CPS records, the judge "was very frustrated with [Ellen] not following through with anything that was court-ordered." Karla moved to Texas to live with Father, who had not had physical contact with her since 2012, and his family. In March 2019, Karla made a third outcry that Father was "doing it again," and Lisa also made an outcry of sexual abuse. The Department filed three petitions seeking conservatorship—one for Ellen, one for Charles, and one for Lisa and Alan. About six weeks after the children were removed, the trial court signed Orders of Aggravated Circumstances as to Mother and Father. *See* Tex. Fam. Code § 262.2015(a). On the Department's motion, the trial court consolidated the petitions into one proceeding, which was tried to a jury in early 2020. The Department sought to terminate the parental rights of Mother and Father but not Ellen's or Wendy's rights.

At trial, the Department played for the jury a recording of Lisa's March 2019 interview. She started out saying that her family loves her very much and takes care of her and then later said that Father lets her "rub on him" to "relax" her. She said in part:

5

> Sometimes when I'm with dad . . . . Well, he touched it but not . . . well . . . he does lots of things that relax me. Some don't relax me so good and he's a good dad. I never told all of it to anyone. . . . The things he was doing to me. [Interviewer asks, "What was he doing?"] Well, a lot. . . . Like letting me rub on him. . . . My mom won't let me rub her. . . . But [Alan] and daddy that's all. . . . [Interviewer asks, "What do you rub, . . . his middle part?"] Yeah. And he's a good daddy. He does also good stuff to protect me.

The children continued to live with Mother and Father for several days, and when the Department conducted a later forensic interview,[4] Lisa recanted her allegation. Detective Brian Wahlert testified that he helped remove the children for their forensic interviews and said that Lisa "came out yelling over and over again, 'My daddy doesn't touch me. My daddy doesn't touch me,' over and over." Lisa reasserted her outcry after she had been out of Mother and Father's care for several months, and several witnesses testified that it was not unusual for child victims of sexual abuse to recant and then reassert allegations against family members.

After the children were removed, law enforcement searched the family's house. Father was charged with more than eighty offenses related to abuse and child pornography. Jennifer Baker, a detective with the Hays County Sheriff's Office, testified that Father was arrested on his way to the airport to go to Armenia, a "non-extraditable" country, and that he knew he had been accused of sexual abuse and was being investigated. Father was carrying about $5,000 in cash, his birth certificate, and multiple computers and hard drives. In their search of the house, law enforcement found additional hard drives and data storage devices, sex toys in public spaces, lingerie that appeared to be child sized, and "pills in the kitchen nook, pills in the bathroom, pills in [Karla's] room." Baker testified that the pills were noteworthy because

---

[4] A forensic interview was described by a witness as "a non-leading non-suggestive way that our forensic interviewers will speak to children when there are allegations of abuse. It allows them a setting that is safe and child-friendly to disclose if abuse has happened."

Karla had alleged that she had been "systematically drugged," and Baker "believed it was melatonin and possibly hydrocodone" used by Father—both were found in the home, prescribed to Father. Father had an outdoor shed, in which law enforcement found a blue fold-out bed that matched Karla's description of a mat on which she was sexually assaulted. In the shed they also found condoms, lubricant, multiple vibrators, and melatonin prescribed to Father, and a black-light examination of the shed showed "that bodily fluids were present."

Baker testified that after she noticed a "Xena Warrior Princess poster" in Lisa's room and found a plastic sword during the search, she "got a really, really uneasy feeling with additional props that were located in the shed" and realized "there was no doubt in my mind that he was producing child porn with these children." Baker also said that the home was very messy and "[b]orderline unlivable," with bugs, roaches, and dirty dishes present, and testified that there was a "chalk drawing of a penis" outside the front door. Several other witnesses also testified that the drawing looked like a penis, but Mother insisted that it was Lisa's version of a musical note or perhaps a cartoon character.

The family's computers showed internet searches for incestuous content, some of which were conducted under Mother's username, but witnesses could not be sure which parent had actually done the searches. Baker testified that the various electronic devices contained "[h]undreds to the thousands" of images of child pornography. The victims appeared to range from "infant basically to 14 or 15 year-olds," and Baker testified that the "average age range" was "[p]robably between 7 to 9." There were photos and videos of both Lisa and Karla, some of which showed Karla "nude, either getting in or out of the shower," apparently taken underneath the bathroom door. Baker also testified about seven redacted photos of Lisa that were admitted into evidence. Those photos show Lisa smiling and posing naked on her bed, lying so that "her

7

breast and vagina" or her "breast and anus" were "fully exposed." Law enforcement also found two guides on grooming children for sexual activity and "cartoon incest animae," which Baker described as cartoons depicting "father/daughter and then images of father/daughter, mother/son in family acts having sexual intercourse"—Karla had described "cartoon incest" in her outcry.

Jennifer Lopez, the family's Department caseworker, testified that she has formed a very close relationship with Karla, who she said is "fiercely protective" of her siblings. Karla "wanted to make sure that her siblings were protected from" Mother and "adamantly did not want [Lisa] and [Alan] to ever reside with [Mother] again," and Lopez said, "Through my conversations with her, my understanding has been that [Mother] knew about the sexual abuse that was going on behalf of [Father] towards [Karla]." Lopez also said Charles had made it "very clear" that he did not want to be around Mother in the future. Lopez testified that although the referral that led to the children's removal "[a]t first . . . seemed like just sexual abuse," the Department "later found out there was physical abuse. The living situation was borderline uninhabitable for young children. There was also pills found everywhere in the reach of children that posed a danger to them amongst all the sex toys and porn that were found."

Lopez recounted that Lisa had said that Father "would rub her" with his penis while the two of them were lying in bed naked, that his penis went inside of her vagina, and that he would touch her vagina with his hands. Lisa said it "felt like paradise" and "like hot sand." Asked whether Lisa seemed upset by the questioning, Lopez testified, "It appeared from my observation of her behavior that it seemed normal to her."

Although Mother insisted that a doctor had said that Lisa's public masturbation was stimming behavior related to her autism and that "that's why she was doing it, because of her autism," Mother never told Lopez the doctor's name, produced evidence of an autism

8

diagnosis, produced documents showing she had sought medical attention about Lisa's public masturbation, or claimed she thought it was related to a yeast infection or a urinary tract infection, contrary to Ms. N.'s testimony about Mother's explanations of Lisa's behavior.

Lopez explained that although the trial court initially ordered that none of the parents should have visitation, any of the parents could have filed a motion to seek visitation and, if the Department "saw a parent really trying to engage in services and make a change and learn from their mistakes and were demonstrating learned behavior, then the Department could advocate at a Court hearing for a visitation to occur." In fact, Wendy obtained visitation with Charles after working services in her family plan. Lopez explained that although an Order of Aggravated Circumstances "alleviate[s] the Department from [its] duty to reunify" the children with the parents, meaning it does not have to provide or pay for services, the Department still makes a family plan and checks in to see if the parents "have done anything on it." Lopez explained that services are designed "to teach parents skills so they can demonstrate what they have learned and be better parents" and said that while parents work their services, the service-providers give the Department feedback and notes about the parents' progress. She said:

> The intention of the family plan is always to show the parent what they need to do in order to mitigate our concerns regardless of what our permanency goal is. It was made in order to give [Mother] a way to show that she cared about her children enough to make a change.

Lopez testified that the Department prepared family plans for all of the parents in this case. After the Order of Aggravated Circumstances was rendered, Lopez explained that Mother could still work services, suggested that she seek "free community services," and gave her specific information about "exact community services." She agreed that she told Mother that

9

given the facts leading to removal, regardless of whether she completed her services, "the Department would not change its permanency goals" of termination and adoption. However, she explained to Mother that that fact "didn't mean she couldn't convince a jury if she completed the services that she would be a good parent." Lopez learned that Mother had reached out to the recommended parenting class but did not enroll when the class started in early January 2020. Mother told Lopez said she started therapy in late November 2019 but never provided her therapist's name or contact information and instead "said she forgot or didn't remember."

Lisa and Alan were in a foster home in Texas; Karla had been placed with a maternal aunt in Minnesota; and Charles had been returned to Wendy's care in Minnesota. Lopez testified that Mother had suggested her parents and some out-of-state family members as possible placements for Lisa and Alan but never provided contact information for the out-of-state relatives. The Department started a home study on Mother's parents, but as of trial, they had not provided a medical letter stating that they were capable of caring for young children or taken a protective parenting class. The parenting class was particularly important, Lopez said, because "[f]rom conversations I've had with them, I gathered that the grandparents did not fully believe" Lisa's and Karla's allegations of sexual abuse. Asked whether the Department had "closed the door" to the grandparents as a placement, Lopez answered, "I think that at this time, when it's been almost a year and they haven't made any efforts to complete that, I believe at this time the door has closed." She said, however, that the grandparents could request a new home study.

Lopez said the foster family struggled at first with Lisa's masturbation but had worked on redirecting Lisa and now were getting along "[r]eally great." The foster parents were not seeking to adopt the children but were "willing to keep them as long as necessary." If Mother's and Father's rights were terminated, the Department's adoptions unit would seek a

permanent home for Lisa and Alan. Lopez believed Mother posed a danger to Lisa and Alan because she "cannot recognize any danger indicators," "closes herself off to red flags," and after seeing "red flag after red flag," "still refuses to acknowledge what the danger is." Lopez said:

> [Mother] knew what the outcries of her own daughter were and she still was defending her husband. She knew what the outcries of [Karla] were and she still defended her husband. She knew he had a sexual conviction and she still defended her husband and still allowed for her children to be in a situation that was unsafe. After knowing what the allegations were, she left [Karla and Lisa] with her husband alone . . . .

Lopez believed it was in the children's best interest for Father's rights to be terminated because he "has subjected these children to unimaginable abuse." She believed it was in Lisa's and Alan's best interest for Mother's rights to be terminated because Mother "continues to deny blatant signs of sexual abuse," even at trial; refuses to acknowledge that some people in her life "are unhealthy"; "has not displayed any behavior to allow the Department to make the conclusion that she would protect these children against anyone and anything"; had "demonstrated a pattern of knowingly putting these children in danger"; and had not "gained any skills any different from the day we removed the children."

Counselor Ashley Rios described how abusers groom victims to make them more vulnerable to sexual abuse: "Identification of that victim, building of trust, lower the defenses, getting their buy-in, and then the fourth step could be looked at as a testing of boundaries and five, sexualizing that relationship." Rios, who reviewed the recordings of the three older children's forensic interviews from March 2019, said that only Karla made an outcry of sexual abuse in those interviews. However, when Lisa was interviewed again in January 2020 after making another outcry, she "made a partial disclosure." Rios said that in the later interview, Lisa

11

talked about how much her parents loved her and took care of her, that "it doesn't seem that she has a complete understanding of the sexual abuse," and that some of Lisa's statements "indicate that it may have felt okay to her what happened." Rios was not surprised that Lisa had recanted and then made another outcry because children "feel more comfortable to share about their abuse" after therapy and "if they no longer see a potential offender"—"the closer the relationship from a victim to the offender is, the longer it can take to disclose about abuse." Rios said it was not uncommon for children to "be curious about their bodies and masturbate," but the frequency and public nature of Lisa's behavior was a "red flag" for "sexual abuse trauma." She also said "regressive" behavior like a resurgence of bed-wetting is a red flag for abuse.

During Mother's testimony, she was questioned repeatedly about her claim that she had been told Lisa's masturbatory behavior was likely related to her autism diagnosis. Mother said that she could not remember the name of the pediatrician who she said made the diagnosis in 2016 and that she thought he might have retired. She also said the military clinic the family used only has an appointment line and does not have a direct number she could call to request Lisa's records or to find out her doctor's name. Lisa saw several pediatricians over the years at the clinic, and Mother could not remember any of the doctors' names "off of the top of my head." She testified that one of the doctors told her that Lisa's sexualized behavior was "behavioral" and "self-soothing" and that, when Mother asked if it might be related to her autism, "he said maybe." She also testified that a pediatrician told her that the bed-wetting was not of great concern because Lisa was under twelve years old. Mother was asked about her efforts to get Lisa's medical records, and she said that the clinic "says they need 30 days to provide you with medical records," that she had "applied for them but they haven't been produced yet," and that she started trying to get the records in early January 2020. When Mother

12

was challenged as to why she did not provide Lisa's schools with medical records regarding her autism diagnosis, she insisted she attempted to provide them to the school's office but was told the school did not need them. Mother said about Lisa's behavior, "I wasn't concerned when everyone seemed to feel it was getting better."

Father once spent the night with Karla in his shed even though Mother "told him it was a bad idea" because she "was afraid of false allegations." Father told Mother that they were going to sleep in the shed because he had promised Karla a "camping trip they hadn't gotten to go because the weather was bad and he felt bad so he was trying to make it up to her." She denied Karla's assertion that Mother opened the bedroom door, saw Father abusing Karla, and left without intervening. Mother did not think Karla was "intentionally lying" and said, "I don't know what I think. I just know that I didn't see him hurting her."

Mother testified that she never suspected that Father was abusing Lisa or Karla in any way and insisted she would have left with the children if she had. She also testified that if Lisa had told her about the abuse, she "absolutely would have believed her, absolutely." Mother was asked about whether she "chose to trust" Father over Karla when she made her outcry in 2012, and Mother said, "I didn't think she was lying. I just thought that she was saying what her mother had coached her to say. She had never said anything to me. She had never acted strange in front of her father." She further testified that in 2016, she "chose to trust" Father over Ellen. Mother said that although she received summaries of Lisa's and Karla's outcries from the Department in March 2019, she was not convinced of their truth until she heard the recording of Lisa's outcry about a month later and could tell that "nobody had coached her and asked her leading questions." Mother cut off contact with Father that same day. Mother was asked, "Even knowing that [Karla] had made multiple outcries, when you learned that [Lisa] had also made an

13

outcry, you did not believe that outcry until you heard the tape, is that correct?" Mother answered, "I didn't know what to think. I wasn't sure." Mother thought that Karla made her 2019 outcry to protect Lisa and said she had been told of allegations that Father "would threaten to hurt [Charles] in order to get [Karla] to perform sexual acts."

Mother said she had been told that child pornography was found on the computer in their bedroom, that sex toys were found in the shed and Father's office, that lingerie in sizes 0 or 2 were found in the house, and that Father had pornographic photographs of Lisa on his electronics. Mother said she rarely went into the shed and never saw videotaping equipment when she did, nor did she know what Father kept in his office, explaining that those areas were Father's, "like a mancave thing" "that nobody else went in." Mother testified that Father "was a hoarder" and that the home was crowded no matter her efforts to clean up. Mother agreed that she and Father had "objects of a sexual nature" in the house but insisted that they were generally kept in her and Father's bedroom, not in the public areas of the house and she "made sure those things were put up where [the children] wouldn't see them," noting that the police photos of the house in disarray were taken several days after the children were removed.

Mother started therapy in November 2019 and said she delayed in part because she was depressed after the children were removed. She also said that she "spent a lot of time going to different places" but that most therapists "don't take my insurance." Mother said Lopez had not given her information about how to do counseling or how to obtain a psychological evaluation and had lied in testifying to the contrary. She also said she asked "for ages" for the children's foster family's contact information, but Lopez never provided it. At the time of trial, Mother was looking for employment—she had last worked about four years before trial and had a bachelor's degree in finance. Mother was going to sell the house and move in with her parents,

14

where she had rooms ready for Lisa and Alan, and she knew Lisa would need therapy and said she would make sure that happened. Mother said her parents will help support her and the children, including paying for Lisa's therapy and providing child care, while Mother gets back on her feet. If the children were returned, Lisa would attend a new school and need a new therapist, but Mother did not believe that would be difficult because Lisa is "a very resilient child." Mother said, "I really think it's important to [Lisa and Alan] [to] have access to their mom [when] they're reeling from what has happened to them," and, "They need to have something familiar from home after everything was ripped away from them. They need to have their grandparents and their toys and loveys and the things that matter to them." Mother said:

> I want the jury to sever [Father's] rights. I don't want that monster to ever come near my children again and I want them to give me back custody so that I can take care of my kids and I can make sure they are safe and they have all the love and safety and security and everything that they need and that they have familiar things and they have the love that they had before they left from me back. . . . I hope he rots in jail and then I hope he burns in hell.

Earley Barnes Ullrich, Lisa's therapist from April to October 2019, testified that children who had been sexually abused might act out their abuse, draw genitalia, have nightmares or tantrums, or have trouble with bed-wetting. She testified that it is uncommon for young children who have not been abused to draw genitalia "[b]ecause usually that's beyond their developmental age to have witnessed or seen those types of body parts." Ullrich testified that Lisa's "self-stimulation" was "not appropriate for her age" and that it, along with her "mood fluctuations," nightmares, bedwetting, and "inappropriate boundaries with respect to personal space," were all symptoms consistent with sexual abuse. Ullrich also testified that the children's foster parents had reported that Lisa "touched her brother's penis on one occasion," which is also

15

consistent with sexual abuse. Ullrich said she would be concerned if a parent noticed a child "exhibiting frequent masturbation both at home and in public for a number of years" but did not take protective measures or seek treatment because parents should be "protective of their kids" and should notice and seek help if a child's behavior or emotions had changed. Ullrich testified that it was normal for an abused child to have difficulty talking about their abuse and said that they commonly recant allegations out of fear. She also testified about grooming, trauma, and the long-term effects suffered by abused children and said that such children need therapy to learn how to process their trauma and cope better. Lisa had improved with therapy and will need support in the future because girls "more often turn to self-harm" and abused children are more likely to engage in risk-taking behaviors. Ullrich had diagnosed Lisa with adjustment disorder and noted her historical ADHD diagnosis, stating that ADHD is often "misdiagnosed in individuals that have experienced trauma." Ullrich did not believe Lisa was autistic, although she did display some symptoms. Asked whether Lisa's masturbating could have been misconstrued as stimming behavior, Ullrich answered, "I would not categorize that for her age."

Psychologist Chardonnay Poole conducted Lisa's psychological evaluation in May 2019. Dr. Poole noted that among the concerns raised by the Department and Lisa's foster family were reports that Lisa engaged in frequent, public masturbation; attempted to touch Alan "inappropriately" during a bath; had recanted her initial accusation and "appeared to be coached" to say that Father "was a good dad and he keeps her safe"; and showed "trauma-related symptoms," including "flinching, being easily scared, avoidance of conversations and feelings, difficulties concentrating, restlessness, disassociation, and hypervigilance." Dr. Poole said, "I do believe that she was exposed to developmentally inappropriate behavior at some point in her childhood." Lisa's knowledge of sexualized behavior was "beyond what she should have known

16

at seven," and Dr. Poole testified that the "majority" of other children who exhibited similar behavior had been sexually abused. Dr. Poole said that it was possible Lisa did not understand that she had been sexually abused and that when children "don't know what appropriate, inappropriate touch is, that can also make it difficult to make an outcry." Dr. Poole testified that it was common for a child who has been abused to recant an accusation and want to go home. She said that she would be concerned if a parent left her children "with the abuser just before the forensic interview" and that such behavior would not be protective. She was also concerned that if Lisa did not get sufficient therapy, she might victimize other children as she gets older.

Dr. Poole acknowledged that she was not trained on diagnosing autism or Autism Spectrum Disorder. However, she testified that there was "no cause and effect" between autism and masturbation and that she did not believe Lisa was autistic because Lisa made eye contact, was socially engaged, and wanted to talk. Dr. Poole had diagnosed Lisa with "attention deficit hyperactivity disorder, combined presentation; post traumatic stress disorder, child neglect, and child sexual abuse, which was suspected."

Psychologist Aaron Pierce interviewed Mother but had not spoken to the children or watched recordings of any of their interviews. He explained that he had been asked to testify as to whether Mother "should have been aware that sex offending was occurring, her children were being abused." Dr. Pierce said that there were many possible symptoms of sexual abuse, that "different people respond so differently," and that "there are no specific signs or symptoms that are tied only to sex abuse." Dr. Pierce testified that neither frequent masturbation nor bed-wetting by a seven-year-old "tells you that definitely sex abuse has occurred" and that such behavior might be seen "in an abused child but you can see that in kids that have never been abused." He said, "There's absolutely no scientific literature ever published that says that

17

anybody has the ability to determine if a child has been sexually abused simply from watching a child, talking to a child, or through any particular symptoms, signs or behavior changes. It is absolutely impossible." Dr. Pierce cautioned against "hindsight bias," meaning that "looking back from now, you say there were things that occurred that should have told me something was going on and that's faulty."

Lisa and Alan's foster father testified that the children had been with him and his partner since April 2019. He testified that at first Alan was "kind of shy," very sweet, and quiet and that Alan "had a lot of separation issues" when dropped off at day care, including crying and needing time to settle down. He initially played mostly with Lisa and not with other children, but now "he's pretty much one of the most popular little kiddoes in his toddler class. Everybody gets excited when he walks in." At first, Alan had trouble sleeping, "having multiple nightmares each night," and "[v]ery frequently we had to sleep in the room next to his bed to calm him," but by the time of trial, he could self-soothe and was sleeping on his own in his own bed. The foster father also testified that Alan at first did not speak "very much at all," so they took him to an ear, nose, and throat specialist, who found fluid blockage in Alan's ears. Since getting tubes in his ears and starting with a speech therapist, Alan now "uses a mix of sign language and he has a lot of different words now, about 30 to 40."

When Lisa was first placed with her foster family, she was considered to need a "severe" level of care, meaning she required "[c]onstant supervision, you have to be with her pretty much 24/7 and constantly helping her to get through every task in the day." The foster father testified that Lisa "has some of the most severe ADHD I have ever seen." In addition, Lisa used to masturbate multiple times a day in communal areas of the home or out in public, and when corrected or redirected, Lisa said "that her father would let her do that in the living

18

room" and "that her mom would tell her to go and leave the living room if mom ever saw that." Lisa also "said something about him putting his vagina in her mouth. I'm pretty sure she mixed up the terminology or didn't understand fully what was going on." The foster parents have been working on redirecting Lisa and are teaching her different self-soothing techniques, and by trial, Lisa had been moved to a moderate level of care. Her behavior had improved, her frequency of public masturbation has greatly reduced, and when redirected, "she either stops immediately and just says, oh, okay, and she catches herself and goes back to doing what she's doing." Lisa also goes to a behavioral therapist at least once a week and has begun speech therapy. As for Lisa's general behavior at school, her foster father said:

> She's getting better at it but she has kicked kids and hit kids, scratched kids, but for the most part she's getting better about it keeping it under control. She wrote a letter to somebody rather than kicking them to tell them how she felt about a thing. She has had a few outbursts, especially if she feels like she's being bullied. So, when I go to talk to her and try to understand what was going on.

Her grades have improved and she has "made a lot of progress and done a lot of catching up."

The foster father testified that Lisa and Alan had both come "a very long ways" and had greatly improved since living in his home. He said that "when they first came to us there was a lot of manipulative behavior, a lot of different problems going on," but that they are "great, great kids" and that he and his partner would try to adopt them if they could.[5] He said "[t]hey have come a long way, resilient kids" and "[t]here's a lot of different examples of how much happier they have become now since they have stabilized and come to a nice connection with us." Lisa "can talk with me and just level with me and say, hey, this is what I think about

---

[5] Lisa and Alan's placement is licensed as a foster home, not an adoptive home. Lisa and Alan were placed there as an "emergency placement" and had remained longer than expected. The foster parents have family and medical issues that prevent them from adopting the children.

something." The foster father testified that Lisa and Karla "really love each other" and that Lisa gets very excited about phone calls with Karla. Lisa and Charles are also bonded, although "[i]t's not quite as deep as the bond with Karla, but still all the kids are really affectionate with each other; really, really loving, kind." Lisa and Alan are very close, and their foster father thought it would be "very traumatic" if they were separated. Asked about their feelings toward Mother, the foster father said, "They do miss her a lot and they—when they talk about her, there is a lot of love when they communicate that and they sense—my impression is that they sense from her that she loves them very much." The children "want to go back with mom," and he believed it would benefit them to have visits and for their connection with Mother not to be severed but did not know whether it would be good for them to be placed in her care again.

The children's CASA volunteer believed Mother's rights should be terminated because Mother had repeatedly failed to be protective of the children and made excuses and shifted blame "onto everyone else," for example, asking "why didn't CPS make a finding in that investigation" and why didn't the school "tell her why [Lisa's] masturbation behavior which is so disruptive in the classroom is so important." The CASA volunteer did not believe Mother could be properly protective or understand and meet the children's needs. She also expressed concerns about Mother's general "lack of insight" about the risks the children were subjected to and noted that she had not "seen anything throughout the pendency of the case that would indicate she's taken any steps to educate herself with regard to how she can go about recognizing those red flags in the future." The CASA volunteer believed Mother was still in denial about the extent of Lisa's abuse and had "failed to recognize the significance of the masturbation behavior," particularly in light of Karla's outcries and Father's "previous criminal conviction."

20

Mother called two of Father's personal friends as witnesses. Both said they never observed anything alarming in the family's home or in Lisa's behavior, and both were shocked by the allegations against Father. One of the friends said that Lisa "ran around and played and she gave her dad hugs and then would run off, you know, same as any kid I have ever known." He acknowledged that the house was "cluttered" but said "so is every house that I know of with kids." He also said Father had told him about Karla's outcries but claimed Ellen "was a drug addict and her grandparents were essentially bribing her and coaching her on what to say."

Mother's father (Grandfather) testified that he and his wife were close to Mother, Lisa, and Alan. He testified that he and his wife had obtained the doctors' notes requested by the Department but never gave them to the Department because he understood "that we weren't candidates any more." He also testified that they did not take a protective parenting class because they were "pretty expensive." Grandfather acknowledged that he was convicted of aggravated assault with a deadly weapon in 2005. He explained that he rear-ended someone in a road rage incident while he was "having medication issues" but his medications have been adjusted and he has been stable since 2007. Grandfather never saw sex toys, pill bottles, or lingerie lying around Mother and Father's house, although he agreed the house was "cluttered." Grandfather testified that Mother was living with him and that she and the children could stay there for a while but not permanently because of his and his wife's limited income.

The Department introduced photographs from its search of the house; the redacted photos of Lisa; the family plans and Orders of Aggravated Circumstances; recordings of Lisa's outcry and Karla's 2012 and 2016 interviews; the family's psychological evaluations, in which Charles reported that Father began to physically abuse him when he was ten or eleven; and Karla's Minnesota CPS records and therapy notes, including her therapist's 2017 opinion that:

21

[Karla] was severely sexually abused by [Father] multiple times. I do not believe she has been coached as she has made statements not characteristic of individuals who have been coached. . . . Client physically showed signs of extreme distress when speaking about her father in session and reports being afraid he will kill her and her family. Client has been adamant that she does not want any contact with [Father], and to this date, continues to be adamant that she have no contact with him. At that time, Client presented with symptoms representative of children who are victims of severe sexual abuse.

At the conclusion of the eight-day trial, the jury determined that Mother's and Father's rights should be terminated; that Wendy should be Charles's sole managing conservator; that the Department should be managing conservator for Karla, Lisa, and Alan; and that Ellen should be Karla's possessory conservator.

Mother argues on appeal that the trial court erred in consolidating her children's case with Karla's and Charles's; that the court erred in admitting into evidence the family service plan prepared for her by the Department; that the court should have granted her motion for new trial based on newly discovered evidence; and that the evidence is legally and factually insufficient to support the jury's findings of statutory grounds and that termination was in the children's best interest.

**CONSOLIDATION**

In her first issue, Mother argues that the trial court erred in consolidating the three cases. A trial court has broad discretion to consolidate cases "that relate to substantially the same transaction, occurrence, subject matter, or question" such that the evidence "will be material, relevant, and admissible in each case." *In re Gulf Coast Bus. Dev. Corp.*, 247 S.W.3d 787, 794 (Tex. App.—Dallas 2008, orig. proceeding); *see* Tex. R. Civ. P. 174(a). The purpose of consolidation is "to further convenience, to avoid prejudice, and to promote the ends of justice," but "[t]he rights of the parties to a fair trial cannot be compromised in the name of judicial

economy," and a trial court "has no discretion to deny separate trials when an injustice will result." *In re Ethyl Corp.*, 975 S.W.2d 606, 610 (Tex. 1998) (orig. proceeding). The trial court should balance judicial economy and convenience against "the risk of an unfair outcome because of prejudice or jury confusion" and should not consolidate if it will prejudice the complaining party. *Gulf Coast*, 247 S.W.3d at 794-95. We may not presume prejudice, and instead the appealing party must demonstrate actual prejudice. *Id.* at 795.

The Department filed a motion to consolidate and at the hearing on the motion stated that each parent had filed a jury demand, that there were limited available jury settings, and that judicial efficiency would be best served by consolidation. The Department also stated that because the investigation was still ongoing, the earliest it could be ready for trial in any of the cases would be January. Mother, Father, and Wendy objected to consolidation. Mother argued that because she was the only mother against whom there was an Order of Aggravated Circumstances, the Department was thus not working toward reunification, and Mother wanted "to have a jury trial set sooner rather than later." Mother stated that if the cases were consolidated, she could not proceed to trial "until after the Department has allowed the other two mothers—it would prolong the case unnecessarily, I feel, for these two children." Wendy and Father, on the other hand, expressed concerns that their rights would be prejudiced by proceeding to trial along with the other parents. Wendy argued that going to trial with Father or Mother would be "unduly prejudicial" because there were no allegations of sexual abuse related to Charles. Father also argued that consolidation would be prejudicial. The trial court noted that if there was a separate trial as to Charles, "it would have to be with [Father]. I'd have to give you three different jury trials for each mother and the father in three different cases." The trial court granted the motion to consolidate, noting, "How many times do we come in here or do we have

23

jury trials for a mom and three daddies all in the same case? We don't separate those out. I'm not going to separate these out, too."

On appeal, Mother asserts that "substantial" amounts of evidence that had "no direct correlation" to Mother was properly admitted because it was relevant to another parent. She also contends that "all parties were allowed to question witnesses about all issues in the case," which led to a "conscious and deliberate collaboration between the attorneys for the Department and the other attorneys, wherein the attorneys for other parties (particularly the Ad Litem for [Karla]) would ask questions of witnesses at the request of the Department's attorneys." She argues that the evidence was "highly prejudicial" because it was "difficult for the jury to determine which evidence to consider or ignore" with regard to Mother and that the questioning "created confusion for the jury and served only to unduly prejudice the jury."

However, Mother did not argue prejudice before the trial court—she argued against consolidation based only on her desire to have the matter heard quickly. *See Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 159 (Tex. App.—Austin 2017, pet. denied) ("To preserve error for appeal, the argument made in the trial court must comport with the argument made on appeal."). Nor does Mother cite to any instances in the record indicating "collaboration" between the attorneys or of Karla's attorney ad litem asking questions at the Department's behest or explain why the Department could not simply have asked its desired questions. Further, the trial court could reasonably have concluded that evidence about whether Father abused Charles and about his abuse of Karla over a period of years was relevant to whether Mother was properly protective of Lisa and Alan. *See J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (in determining whether domestic violence endangered children, it is not necessary for

24

violent conduct to have been directed at children).  Finally, most of the evidence related to the Department's investigation into the family—such as evidence seized from Father or in the search of the family's home, information about Mother's knowledge about Karla's original outcries or Father's attempt to flee the country, and evidence about Father's conduct with his children—was common to all three cases and intertwined to such a degree that separating the cases would have been almost impossible.  The trial court correctly observed that if it tried the cases separately, most of the same evidence would have to be presented three times as the court tried Father's rights to Karla separately from his rights to Charles separately from his rights to Lisa and Alan.  Mother has not shown that the trial court abused its discretion in consolidating the three cases together for trial.  We overrule Mother's first issue on appeal.

## FAMILY SERVICE PLAN

In her second issue, Mother argues that the trial court erred in admitting into evidence the family service plan created for her by the Department.  She contends that because the Department was not obligated to create the plan due to the Order of Aggravated Circumstances, the plan was of no effect and was irrelevant.  She insists that the admission of the irrelevant plan was "highly prejudicial to [Mother], confusing and misleading to the jury," particularly because Lopez testified that Mother could not have changed the Department's goals of termination and adoption by working any services and because the Department questioned Lopez at some length about whether Mother had completed any services.  As with Mother's first issue, a challenge to the trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion.  *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Murray v. Texas Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 367 (Tex. App.—Austin 2009, no pet.).

25

The Department did not seek to terminate Mother's rights based on her failure to comply with a court order but argued that the family service plan and temporary orders were relevant to show whether Mother had made any effort to show she could be a safe and protective parent. It sought to introduce the family service plan after Mother testified:

> I'll do whatever I have to for the rest of it. I'll take care of my daughter and make sure both kids have everything they need, no matter what I have to do. I will take care of them. If I have to work two part-time jobs or three part-time jobs, whatever, I will do that. I will take care of them. There is nothing I wouldn't do for them.

Mother's attorney objected that the family service plan was irrelevant because "there was no plan of service that was ever ordered or required by the Court." She noted that the Department did not offer Mother services and that Lopez had testified that Mother could not have changed the Department's permanency goals by working services. The Department responded that although it had no duty to seek reunification or pay for services, whether Mother attempted any services was "extremely relevant because if she would have attempted to do those, we could be in a completely different situation." The Department asserted, "They have had plenty of cases with aggravated circumstances, maybe not plenty but a handful, at least half a dozen over the time I have been here where the parents actually got their kids back because they went out and worked their own services and that is completely the difference." The trial court said, "I can't say that's not relevant necessarily at this point," and allowed the plan into evidence.

Mother asserts that the family service plan was irrelevant, prejudicial, confusing, and misleading but provides little explanation of how it was prejudicial, confusing, or misleading. Further, the trial court would not have abused its discretion in deciding that the family service plan was relevant. Although the Order of Aggravated Circumstances relieved the

26

Department from a statutory duty to create the plan or to pay for services, *see* Tex. Fam. Code § 262.2015(a), Lopez testified that the Department created a plan nonetheless, explaining that the Department creates plans in such cases so that a parent can improve their parenting abilities and demonstrate to a jury that they can be a safe and appropriate parent. Because it is for a jury as fact finder, not the Department, to determine whether termination of a parent's rights is in a child's best interest, a parent's efforts to learn how to be a better and more protective parent may be relevant. The trial court did not abuse its discretion in determining that the family service plan and Mother's efforts to comply with the services the Department believed would be helpful were relevant for the jury's consideration. We overrule Mother's second issue on appeal.

## MOTION FOR NEW TRIAL

In her third issue, Mother argues that the trial court should have granted her motion for new trial. Mother asserted in the trial court that she was entitled to a new trial because she had finally obtained Lisa's medical records, she should be allowed to produce expert testimony about autism and stimming, the evidence was factually insufficient to support termination, and the interest of justice required it.

We review the trial court's denial of a motion for new trial for an abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). A party seeking new trial due to newly discovered evidence must demonstrate in the trial court that:

> (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted.

*Id*. Mother attached her affidavit to her motion, averring that on January 3, her attorney told her:

27

that the court had ruled on the Department's Motion to Compel Discovery and that I would need to provide any medical records in my possession plus either a) provide the Dept with the information for the medical records and a signed release by l/6/2020 to allow them to obtain the records OR b) obtain the medical records and provide those to the Dept.

She further averred that on January 6, she went to the children's medical clinic and requested a copy of Lisa's medical records and signed a release to allow the Department to obtain the records. She said that because of "red tape," she could not get the records that day and was told they would be sent to her. She "finally received a copy of [Lisa's] medical records in the mail on February 14, 2020, a week after the conclusion of the jury trial."

The Department sent Mother a discovery request asking for the records on October 11, 2019. When Mother did not produce the records by the initial deadline, the Department filed a motion to compel on December 18, and the trial court granted the motion on January 2, 2020. On January 6, Mother made her first attempt to obtain Lisa's records, despite asserting repeatedly in the months leading up to trial that she believed Lisa's masturbation was stimming related to her autism diagnosis. The trial court could have determined that Mother's lack of diligence contributed to the delay in obtaining Lisa's medical records. *See id.*

Further, Mother has not established that the records were not cumulative or were so material that they would probably have produced a different result on retrial. *See id.* The records, which Mother attached to her motion, consist of medical notes from March 2015 stating that the clinic recommended that the Autism Team assess Lisa due to "demonstrated behavior" and delayed milestones in language and speech. The records state that Lisa's "expressive and receptive skills are severely delayed for her age" and that she showed "differences in nonverbal communication (e.g. delays in use of gestures and integrated eye contact in communication) that

28

are beyond what one would expect for a mixed expressive-receptive language delay." The records also state that Lisa has a "neurodevelopmental profile which remains most consistent with an autistic spectrum disorder," ask for additional evaluations, recommend a follow-up with the Autism Assessment Team, and provide a "provisional diagnosis" of Autism Spectrum Disorder. However, the records do not make it clear that Lisa was in fact diagnosed with autism, nor do they indicate whether Lisa actually had a follow-up appointment with the Autism Team. There are no notes from the period in which Lisa engaged in masturbatory behavior, and the records thus do not show that Mother sought medical advice about that behavior, much less state that the masturbation might be stimming. The trial court could have determined that the records were cumulative of Mother's testimony that she believed Lisa was autistic and that her masturbation was stimming and did not provide any material facts relevant to the case. The trial court did not err in denying Mother's motion insofar as it sought a new trial due to Lisa's medical records.

Mother also argues that she should have been granted a new trial to present expert testimony about Lisa's asserted stimming and whether masturbation is related to autism because the Department did not state in their discovery disclosures that Rios or Ullrich "would be presenting testimony regarding behaviors of children" with Autism Spectrum Disorder.

Rios testified that Lisa's public masturbation was a "red flag" for trauma, specifically "sexual abuse trauma," and that there were "red flags that indicate that [Lisa] was sexually abused." On cross-examination by Mother's attorney, Rios was asked what behaviors are observed in children who have been sexually abused that "you would never see in a child that's never been abused," and she answered, "Excessive masturbation without awareness for boundary or redirection." Mother's attorney asked if there were alternative causes, such as

29

autism, and she said, "In my experience, no." She was asked if it would be reasonable for a parent to rely on a pediatrician's statement that it was "possibly due to autism," and Rios said a parent would "want to believe" a pediatrician's statement to that effect because a pediatrician is "likely someone in a place of power." Mother never objected to Rios's testimony that masturbation, in her experience, was due to sexual abuse.

As for Ullrich, she testified that drawing genitalia, nightmares, and bed-wetting are common symptoms of sexual abuse. She also testified that Lisa had some symptoms of autism, such as isolating herself rather than playing with peers, some speech delays, and "issues with perseverating on things, like focusing really closely on something for a long period of time." However, based on her observations, Ullrich did not believe Lisa met the "full criteria for autism" and said autism was "not a diagnosis I would give her." Ullrich said that masturbation was not a sign of autism and that, based on her training and experience, public masturbation or self-soothing is not a sign of autism. On cross-examination, Mother's attorney asked about Ullrich's experience with autistic children, and she said she had worked with "quite a few" and had "taken training as far as diagnosing kids with autism" and described behaviors associated with autism, such as trouble with eye contact, interactions, understanding social cues, or knowing boundaries. Asked whether Lisa's masturbation "could have been misconstrued as" stimming, she answered, "I would not categorize that for her age." Ullrich agreed that it is often easy to look back on an array of behaviors and realize in hindsight that they were indicators of abuse. Mother did not object to Ullrich's testimony about whether she believed Lisa was autistic or whether her behavior might be autistic stimming.

Mother did not object when Rios and Ullrich testified about their opinions on whether Lisa is autistic or whether public masturbation is autistic stimming behavior, nor did she

30

indicate that she was surprised by their delving into those subjects. Mother had raised those issues in her opening statement, asserting that Lisa had been diagnosed with autism and that Mother believed Lisa's behavior was autistic stimming. Further, Mother did not identify in her motion for new trial who would testify on her behalf, much less provide any details about what that expert would say. She only stated that she should be able to present rebuttal evidence from "a professional in the field of [Autism Spectrum Disorder] [to] show that behaviors such as those [Lisa] was displaying could be a stimming behavior in children w/ASD." The trial court did not abuse its discretion in denying Mother's motion for new trial based on her assertion that she should be allowed to present expert evidence about stimming and Lisa's autism, and Mother has not established an abuse of discretion in denying her contention that a new trial would further the interest of justice. We overrule Mother's third issue on appeal.

## SUFFICIENCY OF THE EVIDENCE

In her fourth and fifth issues, Mother argues that the evidence is legally and factually insufficient to support the jury's findings of endangerment and best interest.

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We must defer to the decisions of the jury, which, "having full opportunity to observe witness testimony first-hand, is

31

the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we do not ignore undisputed evidence contrary to the finding but otherwise assume the jury resolved disputed facts in favor of its finding. *Id.* at 630-31. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.*

Termination of the parent-child relationship may be ordered under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(D), and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(E). The Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Subsection (D) focuses on the child's environment, while subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home" is part of the environment under subsection (D). *Id.*

Best interest is considered in light of the factors set out in *Holley v. Adams*: the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Mother insists that the evidence is insufficient to establish that she knowingly endangered the children, arguing that the Department relied on an assertion that she "*should have known* about the sexual abuse" rather than establishing that she had actual knowledge of the risk and disregarded it. However, Mother knew that Father had pled guilty to a charge involving his relationship with underage Ellen, which resulted in Karla's birth when Ellen was fifteen. She knew that Karla had made allegations of sexual abuse by Father in 2012 and again in 2016. Although she claimed that she had only Father's version of those events and did not have Ellen's contact information, the jury could have concluded that Mother did not attempt to investigate Ellen's and Karla's version of the events and instead accepted Father's assertions despite having learned that he had lied to her during their marriage, including about having an extramarital affair. Mother said she rarely went in the shed or in Father's office and she did not use his computers or storage devices and insisted that the photos of the family's home were taken after

33

the children had been removed for a week. However, Mother admitted that the house was cluttered and that Father was a hoarder, the photos show numerous sex toys and small-sized lingerie in the home, and there was video-recording equipment set up in Father's shed—the same shed in which Father slept alone with Karla, despite Mother's warning him against it because of Karla's earlier accusations. Mother insisted that she spoke to medical professionals about Lisa's masturbatory behavior or bed-wetting and was assured that it was related to Lisa's autism but did not provide any evidence to that effect beyond her own testimony. Finally, although Mother denied it, Karla claimed that Mother walked in on Father abusing Karla but did not act to stop it.

The Department did not have to establish that Mother had actual knowledge that Father was abusing Karla and Lisa; it could satisfy its burden by showing that Mother was aware of the potential danger of abuse and disregarded it. *See Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Fox v. Texas Dep't of Fam. & Protective Servs.*, No. 03-05-00761-CV, 2006 WL 820947, at *3 (Tex. App.—Austin Mar. 30, 2006, no pet.) (mem. op.); *In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied). We must defer to the jury's reasonable determinations on witness credibility, *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), and it is up to the jury to weigh the evidence, draw reasonable inferences, and choose between conflicting inferences, *In re S.B.*, 597 S.W.3d 571, 582 (Tex. App.—Amarillo 2020, pet. denied). Based on this record, it was well within the bounds of reason for the jury to have concluded that Mother knew Father posed a potential risk to the children and chose to disregard it—indeed, the jury could have disbelieved Mother's denials and concluded that she had actually witnessed an incident of Father abusing Karla. We overrule Mother's fourth issue on appeal.

As for best interest, it is true that there was evidence that Lisa and Alan are bonded to Mother and miss her. Their foster father believed the children would be best served by maintaining a relationship with her, and their attorney ad litem argued that it would be in their best interest for her rights to be preserved. Mother also presented evidence that she was looking for work and had a stable place to live with her parents. However, her father said that arrangement was only for a limited time due to her parents' limited resources. Further, Mother did not seek counseling, as recommended by the Department, until shortly before trial, explaining that she delayed because she was depressed, and while that might be understandable, the jury could have viewed her delay as indicating that Mother cannot put her children's needs first. Several witnesses testified that Mother missed or ignored multiple warning signs of abuse, and she did not seek to take the parenting class recommended by the Department or work other services that would show efforts to become a more protective parent. Lisa was subjected to prolonged sexual abuse while Mother overlooked warning signs, Mother cautioned Father against sleeping alone with Karla in the shed because of Karla's outcries, Karla alleged that Mother witnessed an incident of abuse, and there was evidence that Father was physically or emotionally abusive to Charles in Mother's presence. Mother acknowledged that Lisa would require therapy in the future but did not explain how she would be able to meet that need once her parents could no longer help her financially. Lopez and the CASA volunteer believed that it was in the children's best interest for Mother's rights to be terminated, noting that Mother missed or overlooked signs of abuse, continued to minimize or explain away the red flags, shifted blame onto others rather than accepting responsibility for her shortcomings, and did not take steps while the case was pending to show that the children were her priority. On this record, we

35

cannot hold that the evidence is legally or factually insufficient to support the jury's best-interest determination. We overrule Mother's fifth issue on appeal.

### FATHER'S APPEAL

Father's attorney has filed an *Anders* brief discussing the record, the elements the Department was required to prove, and the standard of review, and explaining counsel's conclusions that Father has no arguable grounds for appeal and that his appeal is frivolous. *See Anders*, 386 U.S. at 744; *see also In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (explaining use of *Anders* brief in termination cases); *Taylor v. Texas Dep't of Protective & Reg. Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied) (applying *Anders* procedure in termination case). Father has filed a pro se brief arguing (1) that the case should have proceeded under Indian Child Welfare Act ("the Act"), which requires proof beyond a reasonable doubt in termination cases, *see* 25 U.S.C. § 1912(f); *see generally id.* §§ 1901-1963; (2) that the Department's attorney committed misconduct by making certain "misrepresentations"; and (3) that he received ineffective assistance of counsel.

In Father's first argument, he insists that the Act and its higher burden of proof apply because although Karla is not eligible to be a member of the Bois Forte Band of Chippewa, she is eligible through her maternal grandmother to be a member of the Red Lake Band of Chippewa. However, he does not cite to any mention in the record of the Red Lake Band of Chippewa, and in our careful review of the record, we have found that the few references to any Native American lineage only mention the Bois Forte Band of Chippewa. In a pre-trial hearing, the Department explained that Karla is not eligible under the Bois Forte Band of Chippewa's rules, and in Ellen's sister's trial testimony, she referred to the support of her "tribe," not to

36

multiple tribes. Further, Minnesota's CPS records refer only to the Bois Forte Band of Chippewa and state that Karla is "[n]ot eligible for enrollment or membership" and that Ellen is "[e]nrolled or [a] member" of that tribe. They also list only the Bois Forte Band of Chippewa for Ellen's mother, noting her tribal status as "unknown." The record thus provides no support for Father's insistence that the Act should apply because Karla is eligible for membership in the Red Lake Band of Chippewa. We overrule Father's first pro se issue.

In his second argument, Father argues that the Department's attorney made "fraudulent" misrepresentations that amounted to fundamental error because she stated (1) that Karla was only eligible for membership in the Bois Forte Band of Chippewa and (2) that Father's Minnesota conviction required him to register as a sex offender. However, as noted above, the record does not support Father's assertion of "misconduct" related to Karla's possible eligibility for membership in any tribe other than the Bois Forte Band of Chippewa. As to the second alleged misrepresentation, after being charged with third-degree criminal sexual conduct, Father entered into a plea agreement and pled guilty to a lesser included charge of fifth-degree criminal sexual conduct, which Father insists is most similar to an offense under Section 22.012(a)(1), which does not require registration as a sex offender. *See* Tex. Penal Code § 22.012(a)(1) (defining "indecent assault"); Tex. Code Crim. Proc. art. 62.001(5) (defining "reportable conviction or adjudication"). However, even assuming that to be true,[6] the criminal judgment signed by the Minnesota court in 2007 includes as an additional condition, "register sex offender." Thus, Father was in fact required to register as a sex offender in Minnesota, even if it

---

[6] *Compare* Minn. Stat. 609.3451(1)(1) (person commits "criminal sexual conduct in the fifth degree" if he "engages in nonconsensual sexual contact"), *with* Tex. Penal Code § 22.012(a)(1) (person commits misdemeanor indecent assault if he touches another person's anus, breast, or genitals without victim's consent).

is questionable whether he was required to do so in Texas. *See* Tex. Code Crim. Proc. art. 62.052 (explaining when person convicted in another state must register in Texas). On this record, any questions by the Department about whether Father was required to register as a sex offender cannot be viewed as a "misrepresentation" so as to amount to fundamental error. We overrule Father's second argument.

As to Father's claim that he received ineffective assistance of counsel because his attorney "failed completely to test the [Department's] case," we disagree. Instead, as noted by Father's appellate attorney, trial counsel was an active participant and advocate, cross-examining most of the witnesses, filing a motion in limine, seeking to have certain evidence excluded, and timely filing a notice of appeal on Father's behalf. Father alleges that trial counsel, among other things, "missed numerous major objections" and "presented no evidence," but he does not explain which objections were missed or what evidence or defense counsel might have put forth, much less establish that Father was harmed by any such failings.[7] *See In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (to establish ineffective assistance of counsel, party must show (1) that counsel made errors so serious that he was not functioning as counsel guaranteed by constitution and (2) that party was deprived of fair trial with reliable result). The record does not reflect that Father's trial counsel's conduct was so outrageous that no competent attorney would have so acted, that his conduct fell outside the wide range of reasonable professional assistance, or that his actions were not strategic. *See id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). We overrule Father's third and final pro se argument, contending that he received

---

[7] Father himself testified and refused to answer any of the questions asked of him, pleading his Fifth Amendment rights in response to each one. *See Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) ("the jury in this civil case was free to draw negative inferences from the [defendants'] repeated invocations of the Fifth Amendment").

ineffective assistance of counsel. We agree with appellate counsel that Father's appeal is frivolous and without merit.

## CONCLUSION

Having overruled both parents' issues on appeal, we affirm the trial court's final order of termination. We deny Father's counsel's request to withdraw. *See P.M.*, 520 S.W.3d at 27.[8]

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: August 28, 2020

_____

[8] The right to counsel in suits seeking termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016). Thus, counsel's obligations to Father have not yet been discharged, and the request to withdraw is premature. *See id.* If after consulting with counsel Father desires to file a petition for review, counsel should timely file with the supreme court "a petition for review that satisfies the standards for an *Anders* brief." *Id.* at 27-28.